OPINION OF THE COURT.
This is a motion for a new trial, and the reasons assigned, embrace the whole grounds of the case. Without making points, upon -which the court below have unanimously agreed, but touching them incidentally, I shall confine myself, to such as ha ve-occasioned a difference of opinion. I will in this place premise: that it is and always will be a source of regret, to me, wheu I am so unfortunate as to differ from my brethren of the bench, and it is particularly to be regretted, when the importance of the qussiion is great, and when unanimity is so desirable, both (o the bench, and to the' parties whose interest is the immediate subject of adjudication. But as a judge, I have a duty paramount to all these considerations, which must prevail, however unpleasant to my' own feelings, - and whatever may he the consequence to others.
The facts in this case are not controverted; that the three negroes wore slaves in Virginia; that in seventeen hundred and eighty four they were taken by John Becker to the neighbourhood of Vincennes;'that they remained there from that time until the month of July, 1S16; that the ordinance of Congress, passed in th£ tnonth of July in the year 1?'S7, and that the constitution of the’: state of Indiana was adopted on the 29th June, 1816. 1 hese are the material facts, but the law arising out of the ordinance treaty of cession of Virginia to the United States of that distiict of country and the constitution, is con-traverted. To clear away the difficulties arising from extraneous matter *37 and to place the grounds of this opinion plainly before the court, a short history of the country will be necessary. — The country was within the chartered limits of Virginia, but from the year-until the peace of 1703, it was subject to and claimed by France. By the peace of 63 it was ceded to Great Britain. It will appear by reference to the proclamation of Gen. Gago in 1775, and to the acts of Col. Wilkins in granting lands as governor of Illinois, that it was under a government distinct and separate from the then colony of Virginia. During- our revolutionary war, it was conquered by the arms of Virginia, but there has been exhibited no evidence to show that the laws of Virginia wore ever extended to that country after its conquest, or that Great Britain af:er the treaty of 63, by which she obtained it, ever changed the laws then existing in the province, I have carefully examined the acts of Virginia, and can find no provision extending its laws to that district of country. I think then that it is undeniable, that tbs laws as they existed whi'e it was a province of France, were the municipal laws of the country. This opinion is supported by the treaty of cession from Virginia to the United States, and also by the ordinance of 1787 — the treaty of cession provides, that the French and Canadian inhabitants, and other settlors who profess themselves citizens of Virginia, shall have their possessions and titles confirmed, and be protected in'the enjoyment of their rights and liberties. We find that until the governor and judges shall adopt laws, the manner of passing and transferring estates and sale of personal property declared; saving to the French and Canadian inhabitants, and other settlers of the Kaskaskias and Vincennes and other villages, the laws and c; stoms now in force among them relative to the descent and conveyance of property. If the laws of Virginia were extended to them, there could exist no possible necessity of making the saving clause. The question that necessarily arises is, in what relation did they stand to Virginia? as a province, must be the answer, and in this condition they passed to the United States, under the treaty of cession of Virginia. It is an unquestionable rule, that the laws equally effect all persons and all property within the territorial limits of a state or province, unless there be some special reservation. Wherever a person lives, he puts himself for the time, under the protection of the laws of the place, and John Decker had no privilege distinct from the *38 French and Canadian inhabitants — in the treaty of cession, they were no£ parties, but the subject in part of the treaty. The clause guaranteeing their titles, possessions, rights and liberties, was a matter of favor, and designed for their exclusive benefit. They not being in- a situation to contract for themselves, the sovereign made the contract — the cession of Louisiana is an apt illustration». The rights and privileges they possess arise from the treaty.of cession.. That the sovereign of a conquered' country can make such changes,-alterations- and disposition as he may think proper, is a principle too well established to require the citation of authorities to support it. But it is said that a- treaty is a sacred instrument, and cannot be violated — this is admitted,, but the question then arises, is the clause in the ordinance prohibiting slavery, or involuntary servitude, a violation of the treaty of cession. Before an act of congress is declared inoperative, for violating fundamental principles, the court ought to be fully and completely satisfied. I have endeavored to show, in what condition these people were after the conquest by Virginia, what rights they possessed, and the rights they acquired under the treaty of cession. From the facts, authorities and reasons advanced, these consequences result, that as conquered countries, they were subject, to such laws as the conquerers chose to impose, that the legislature of Virginia not making any change in their laws, the ancient laws remained in full force, and that the “titles, possessions, rights and liberties,” guaranteed, were those they enjoyed, prior to the conquest, the “lex loci,” not as citizens of Virginia, but as a provincial appendage. We will now come to-the ordinance, and the sixth article of the compact, which declares, “there shall be neither slavery nor involuntary servitude in said territory otherwise than for the punishment of crimes, whereof the party shall be duly convicted.” Preceding the sixth article, it is ordained and declared, that the six articles shall be considered as articles of compact, between the original states, and the people and states in said territory, and forever remain unalterable, unless by common consent. The legislature of Virginia assigns, as one of the reasons for the alteration made in the treaty of cession, was to ratify and confirm the said article of compact, between the original states, and the people and states of the said territory. That the sovereign may contract with the people, is an acknowledged principle, and *39 the only question is, whether the compact shall he obligatory on the parties. That the people of the territory were parties is evident, that their condition was changed from absolute subjection, to the condition of free men, is equally clear. Then the question is, did not congress give a valuable consideration for the concession by the people in the sixth article, the privileges and immunities of freemen, for the freedom of their slaves, and have not the petitioners a right to claim the benefit of this article. But it is contended, that the treaty of cession is obligatory and binding, and not to be altered not'even by the people themselves. Let usfior a moment examine the nature and qualify of the provision guaranteeing their titles and possessions, rights and liberties, does it relate to their political or civil condition, if (he latter is it not merely a personal benefit, and as such they have a right to dispose of it. To sav they could not dispose of their pro-pertv, would be denying them a privilege inseperable from property and its dominion. If they could dispose ofit individually, what reason can be offered, why they should be debarred, in their character of a people, from contracting with their government for the freedom of American citizens; to mv mind there can be none, but it is said to be a fair construction of that clause in the ordinance, that notwithstanding the express words that there shall not be slavery or involuntary servitude except for crimes and after conviction, yet the petitioners must be slaves, by the potency or the clause in the treaty of cession “that their titles and possessions, rights and liberties shall be secured to them.” For my own part, viewing as I do the clause of the ordinance as a compact between the original states, and the people and states of said territory, it is too plain to require construction In doubtful matters, we resort to construction, but to give it the construction contended for by the defendants counsel, would contradict what it so clearly declares. The ordinance provides that there shall be neither slavery nor involuntary servitude, otherwise than for the punishment of crimes, excluding all kinds of servitude, except that which follows a conviction. But according to the construction of the defendants’ counsel, those who were slaves at the passing of the ordinance, must continue in the same situation, Can this construction be correct? Would it not defeat the great object of the general government. It is obvious it would, and it is inadmissible upon every principle of legal construction. Considering *40 the six articles of compact equally obligatory and binding, made upon sufficient consideration, all the objection as to the want of power in congress to make the compact with the people of the said territory must vanish. Another point in this case was relied op, namely, that if the petitioners were not freed by the 6th article of the ordinance, they became so by the adoption of the consfitu'ion of Indiana. Even the power of the people, in their sovereign capacity, is denied, to effect a general emancipation ; to test this, we must first inquire into the source of sovereignty, as understood in these United States, to reside in the people — In all governments whatsoever there must bo of necessity, and in the nature of things, a supreme irresistible absolute and uncontrolcd authority, in which the “jura summi imperii,” or the rights of sovereignty reside, and when we speak of sovereignty in this sense, it is in contradistinction of the powers given under a constitution, or the powers of a limited government, that a constitution emanates from and is a part of that sovereignty in its most extensive sense, as residing in the people, is universally acknowledged by all those best acquainted wtih the theory and principles of our government, that the same power that creates, can change, alter or destroy, is a consequence too clear to'require it to be supported by pvoof. The people restrain the power under a delegated authority,, but put no restraint upon themselves; the acts of the supreme power, though contrary to natural rights, are nevertheless binding. In every case under the social compact there must be an inequality to destroy the validity of the surrender? Among an ignorant and uninstructed people, what are the rights surrendered — Rosseau in his social compact informs us, it is the totai alienation of every individual with all his rights and privileges to the whole community, and assigns the reasons, as one gives himself up entirely, and without reserve, and all are in the same circumstances, so no one can be interested in rendering hurihensome their common connection, and again he says, as the surrender is made without restraint, no one has any thing to retain, if any one had a right distinct from another, which he pretended had not been surrendered, each individual might question (he acts of the social compact, and if this was permitted, it would destroy itself, as there would he no common umpire to appeal to, a state of nature would exist, and the social compact be a splendid bauble — assume the principles laid down *41 is acknowledged, and they do appear to me to be so well established by all jurists and constitutional writers, as merely to require them to be stated, in order to ensure théir admission. The question then resolves itself into this. What were the rights delegated by the people to the convention, or what was the trust or power of that convention? Was all, or only a part of the sovereignty committed to them, and if a part, where are the restrictions to be found? The ordinance only restricts, and .these restrictions are to be found only in the articles of compact, and relate simply to the nature of the government to be formed, and that the principles are not inconsistent with the articles of compact, and one of those very articles is recognised, and made a part of their constitution, under which the petitioners claim their freedom; and how is this claim to be got over? Why, we are told, it is inconsistent with the constitution of theU. States, and tíre treaty of cession from Virginia'. The answer to the latter, will be found- in the opinion given On the first point, and the very reasons the Court have urged, as to the defendants not having been parties to the ordinance, apply in fact to the constitution of the U. States, and as I have already shown, they were parties to the six articles of compact. The constitution of the U. States has nothing to do with this question, and before it could apply, Indiana was received as one of the members of the fJnion, and this was subsequent, and grew out of the adoption of their constitution. If then, I am correct in opinion, that the clause of the constitution of the U. States is inapplicable, and there is nothing in the treaty of compact, contained in the ordinance, inhibiting the convention the power to free the petitioners, by. what right are they held? All those principles assumed must be fallacious; Freedom was extended to the slaves in Massachusetts by their constitution — 1 have ii from high authority, and I have examined their statutes, and can find no general statute of emancipation; and so guarded was our convention upon this subject, that they inhibited the legislature from the exercise of the power, Pennsylvania, Delaware, New-Jersey, New-York, and the New England States, Massachusetts excepted, have legislated on this subject, and that it is a proper subject of legislative interference, when not restrained by the constitution^ is evident by the caution of our convention, and the exercise of the power by the several legislatures before mentioned. But, we are told, that the *42 treaty of cession intervenes. If old Decker was not a party to the articles of compact, it cannot be denied but that he was, or those who claim under him were parties to the constitution of Indiana; if he was, how can he claim a particular exemption from the operation of the constitution, according to the principles of the social compact before laid down, and if inequality was to exempt, would it not tend to destroy it? Does not the first article of the constitution declare the condition of the people of Indiana free, and this condition, by the last section of the first article, is likewise declared to be out of the control of government, or tobe a right reserved to the people. Under a similar provision, slavery was abolished in Massachusetts, and by the 7th section IX. article of the constitution, the sixth section of the ordinance is adopted, and in the 4th section XI. article, all laws conflicting with the provision of the constitution are repealed. Can it be that slavery exists in Indiana? Ifit does, language loses its force, and a constitution intended to protect rights, would be illusory and insecure, indeed. If the language is plain, saying there shall be neither slavery nor involuntary servitude, does it comport with the constitution to say there shall be slavery? This dilemma cannot be got over, by those who give it a construction, that would make the petitioners slaves. Why resort to construction in a case so plain? Do the rules of construing statutes apply to a constitution ? Where does the power reside of restraining the people in their sovereign capacity? Is there any such power recognised? Are we not told that the Parlliament of England can pass any law, however it may violate first principles, and the courts would be bound to enforce it It is in vain to attempt to bind that which is in itself illimitable, irresistible, and supreme. But it is contended that the provisions of the constitution admit of a different construction — that it is prospective, and to give it the meaning its language imports, would violate vested rights. What are these vested rights, are they derived from nature, or from the municipal law? Slavery is condemned by reason and the laws of nature. It exists and can only exist, through municipal regulations, and in matters of doubt, is it not an unquestioned rule, that couris must lean “ in favorem vitas et liber-tatis.” Admitting it was a doubtful point, whether the constitution was to be considered prospective in its operation or not, the defendants say, you take from us a vested right arising from municipal law. The peti *43 tioners say you would deprive us of a natural right guaranteed by the ordinance and constitution. How should the Court decide, if construction was really to determine it? I presume it would be in favour of liberty.
From the view I have taken, I am satisfied, that the petitioners are entitled to have the verdict confirmed, and the motion for a new trial overruled.